# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JAMES TODD BARBER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19CV560 |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, James Todd Barber, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 6 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 8, 10; see also Docket Entry 9 (Plaintiff's Brief); Docket Entry 11 (Defendant's Memorandum); Docket Entry 12 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging a disability onset date of July 23, 2015. (Tr. 216-17.) Upon denial of that application initially (Tr. 121-35, 154-57) and on reconsideration (Tr. 136-53, 159-62), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 165-66). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 78-108.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 54-70.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 13-53, 215, 310-12), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings:

1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2020.[1]

. . .

2. [Plaintiff] has not engaged in substantial gainful activity since July 23, 2015, the alleged onset date.

3. [Plaintiff] has the following severe impairments: ectodermal dysplasia; arthralgias of the neck, shoulders, elbows, and hands; depression, and[] anxiety.

---

[1] On the page preceding this finding, the ALJ indicated that Plaintiff remained insured for DIB through December 31, 201**9**. (See Tr. 58.) However, given that both December 31, 2019, and December 31, 2020, post-date the ALJ's decision (and thus the relevant period in this case), for purposes of Plaintiff's current application for DIB, the Court need not resolve the conflict in the ALJ's decision regarding Plaintiff's date last insured.

2

. . .

> 4.  [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> . . .
>
> 5.  [Plaintiff] has the residual functional capacity to perform medium work . . . except that he can have no exposure to extremes of heat, wetness, and humidity. [Plaintiff] retains the ability to perform simple, routine, and repetitive tasks with routine changes in the work environment. While he can occasionally have contact with co-workers and supervisors, he must never have contact with the public.
>
> . . .
>
> 6.  [Plaintiff] is unable to perform any past relevant work.
>
> . . .
>
> 10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff] has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.
>
> . . .
>
> 11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from July 23, 2015, through the date of this decision.

(Tr. 59-70 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v.

3

Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

4

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id.

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[2]  "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition."  Id.  "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled."  Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps:  "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work."  Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3]  A finding adverse to the claimant at any of

---

[2] The Act "comprises two disability benefits programs.  [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed.  The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical."  Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ."  Hunter, 993 F.2d at 35 (internal citations omitted).

several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

7

both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

### B. Assignment of Error

In Plaintiff's first and only assignment of error, he maintains that "[t]he ALJ committed a reversible error by failing to explain the impact of anhidrotic ectodermal dysplasia on [Plaintiff]'s [RFC]." (Docket Entry 9 at 2 (bold font and single-spacing omitted).) More specifically, Plaintiff asserts that anhidrotic ectodermal dysplasia "is a genetic condition" (id. at 3 (citing https://ghr.nlm.nih.gov/condition/hypohidrotic-ectodermal-dysplasia#synonyms)) and that, "[s]tarting before birth, th[is] disorder[] result[s] in the abnormal development of ectodermal tissues, particularly the skin, hair, nails, teeth, and sweat glands" (id. (citing https://ghr.nlm.nih.gov/condition/hypohidrotic-ectodermal-dysplasia)). Plaintiff notes that "[m]ost

---

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

people with this condition 'have a reduced ability to sweat (hypohidrosis) because they have fewer sweat glands than normal or their sweat glands do not function properly'" and that "'[r]educed sweating can lead to a dangerously high body temperature (hyperthermia), particularly in hot weather[, and i]n some cases, hyperthermia can cause life-threatening health problems.'" (Id. at 3-4 (citing https://ghr.nlm.nih.gov/condition/hypohidrotic-ectodermal-dysplasia).) According to Plaintiff, "no cure [exists] for the condition," but "'preventative and protective measures should include avoidance of physical exertion, protection from high temperatures, and during warm weather, large amounts of dietary fluids, cooling by water such as use of cool cloths and sponge baths, air conditioning, and/or other supportive measures.'" (Id. at 4 (citing https://rarediseases.org/rare-disease/hypohidrotic-ectodermal-dysplasia).)

Plaintiff contends that his "hearing testimony is consistent with the medical literature regarding anhidrotic and hypohidrotic ectodermal dysplasia," in that "[h]e testified that he has no sweat glands, that it is 'hard . . . to get rid of body heat,' and that 'the heat has always bothered [him].'" (Id. at 5 (quoting Tr. 86).) Plaintiff notes that he "usually keeps the air conditioning at home at about 68 degrees," and that "[h]e cannot do much physical activity in a 68-degree room 'because even just . . . walking around dusting, or running the vacuum cleaner in there, [he] still

get[s] warm'" (id. (quoting Tr. 97)), and "[h]e can normally do such activities for only 'about 30 minutes'" (id. (quoting Tr. 98)). Plaintiff emphasizes that "[i]t generally takes one hour to cool down," and that "[i]f [he] is in an environment above 68 degrees, it 'drains' him, he has 'no energy,' and he does not 'feel right the next day' if he lets himself 'get real too hot.'" (Id. (quoting Tr. 98).) Plaintiff further points out that the jobs he "held in the past were performed in a refrigerated environment" (id. at 5-6 (citing Tr. 92)), with a temperature "'usually between 45 and 50 degrees'" (id. at 6 (quoting Tr. 94)).

In light of that testimony and the characteristics of anhidrotic ectodermal dysplasia discussed above, Plaintiff faults the ALJ for "address[ing] only whether the evidence would support a finding that [Plaintiff] would be limited to working in a refrigerated environment" (id. at 7 (citing Tr. 66-67)) and for "fail[ing] to explain how anhidrotic ectodermal dysplasia would affect [Plaintiff]'s ability to engage in the physical requirements of medium work" (id. at 7-8 (citing Tr. 66-67)), as well as "fail[ing] to acknowledge that because of anhidrotic ectodermal dysplasia, physical exertion can dangerously increase [Plaintiff]'s body temperature" (id. at 8 (citing Tr. 66-67)). Plaintiff points out that the "[r]egulations define medium work as requiring lifting up to 50 pounds 'with frequent lifting or carrying of objects weighing up to 25 pounds,'" (id. (citing 20 C.F.R. § 404.1567(c))),

10

and that "[m]any medium jobs also require the ability to stand or walk for [six] hours out of an [eight]-hour workday" (id. (citing Social Security Ruling 83-10, <u>Titles II and XVI: Determining Capability to Do Other Work – the Medical-Vocational Rules of Appendix 2</u>, 1983 WL 31251 (1983))). Plaintiff posits that "[m]edium physical activities would undoubtedly cause [his] body temperature to significantly increase[, b]ut the ALJ failed to explain why [Plaintiff] should not avoid such physical activity." (Id. at 9 (citing Tr. 66-67).) Plaintiff asserts that the ALJ's above-described failures render the "RFC assessment [] unsupported by substantial evidence, as [well as] the step five finding that [Plaintiff] can perform medium occupations." (Id. (referencing Tr. 65, 70.)

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562–63; 20 C.F.R. § 404.1545(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. § 404.1569a(c). An ALJ need not

11

discuss every piece of evidence in making an RFC determination. See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (citing Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)). However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).

The ALJ here sufficiently explained why restrictions to "medium work" with "no exposure to extremes of heat, wetness, or humidity" in the RFC determination (Tr. 65) sufficiently accommodated Plaintiff's anhidrotic ectodermal dysplasia. The ALJ first provided a comprehensive review of the medical evidence of record (see Tr. 60-63, 66-67), which included the following, pertinent findings:

- at a follow-up appointment with Dayspring Family Medicine Associates (Plaintiff's primary care physicians) "[j]ust four days after [Plaintiff's] alleged onset date of disability, . . . [Plaintiff] appeared well-developed and without clinical signs of distress," "objective findings were generally unremarkable aside from an erythematous scaly lesion on the right cheek" (Tr. 60), and Plaintiff "did not make any complaints related to . . . heat intolerance" (Tr. 66 (emphasis added); see also Tr. 358-61);

- "treatment records [from Dayspring] through October 2015 consistently document[ed] relatively unremarkable physical examinations" (Tr. 60; see also Tr. 362-73);

12

- Plaintiff reported to consultative medical examiner Dr. Ernest B. Eason that he "prefer[red to] work[] in cool or cold environments," but that "<u>he had never been hospitalized due to heat stroke or exhaustion and did not have a problem with skin blistering</u>" (Tr. 60 (emphasis added); <u>see also</u> Tr. 314);

- aside from an elevated blood pressure reading, an examination at Dayspring in March 2016 remained "generally unremarkable" (Tr. 61; <u>see also</u> Tr. 380-84);

- "[Plaintiff] continued to maintain follow-up through July of 2017," but "the <u>record does not document any instances of hospitalization second to . . . heat intolerance</u>" (Tr. 61 (emphasis added); <u>see also</u> Tr. 385-406); and

- on July 17, 2017, Plaintiff's "skin was without rash or lesions" and "he appeared well-nourished and well-developed" (Tr. 61; <u>see also</u> Tr. 402).

The ALJ's analysis thus underscores that Plaintiff neither reported nor received treatment for any instances of heat intolerance, heat exhaustion, or heat stroke at any time during the relevant period in this case.

The ALJ also evaluated Plaintiff's subjective complaints of symptoms, expressly discussing his statements that he "lack[ed] sweat glands with resultant difficulty with dispersion of body heat or environmental heat" (Tr. 60; <u>see also</u> Tr. 86, 314), "that he was most limited physically due to poor tolerance for exposure to hot temperatures" (Tr. 66; <u>see also</u> Tr. 86, 94), and that "he described difficulty regulating his body temperature with repetitive movements, such as lifting boxes, that caused him to feel increased

13

body heat" (Tr. 66; see also Tr. 93-95). However, the ALJ ultimately found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 66), and supported that finding with the following reasoned analysis:

> As for [Plaintiff]'s statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent as [Plaintiff] testified that he needed to be in a refrigerated environment all day due to his inability to sweat and tendency to get overheated. However, he also testified that his skin cracked in the cold. Further, the record as a whole does not support a limitation to work only in a refrigerated environment as <u>[Plaintiff] is able to perform day-to-day activities without being in a "refrigerated-like" environment at all times and does not have a history of heat exhaustion or heat stroke. This includes enjoying cooking and cleaning, two activities that will increase one's body heat</u>.

(Tr. 66-67 (emphasis added) (internal citations omitted).

Plaintiff faults the ALJ's above-quoted analysis for "fail[ing] to address [Plaintiff]'s testimony that he can perform only about 30 minutes of household activities in an air-conditioned environment and that to cool down afterwards, he must put cold rags on his head and strip down to wearing only shorts for one hour." (Docket Entry 9 at 8 (referencing Tr. 97-98).) That challenge fails, because the record contains multiple statements describing Plaintiff's ability to engage in daily activities which, to a fair degree, conflict with Plaintiff's testimony that he limits his

14

activities to 30 minutes at a time in an air-conditioned environment. For example, in contrast to Plaintiff's above-quoted testimony, the ALJ noted that Plaintiff "report[ed] going to the drag strip when the weather was permissible" (Tr. 61; see also Tr. 416), that Plaintiff "report[ed] cleaning and cooking as strengths" and "stated that he had made a steak dinner for his family" (Tr. 62; see also Tr. 411), that Plaintiff "expressed openness to applying for a job at a local plant" (Tr. 62; see also Tr. 428), that Plaintiff "had an upcoming out-of-state trip planned with his best friend" (Tr. 62; see also Tr. 435), that Plaintiff could "provide personal care, care for his dog, [and] assist with household duties and yard work" (Tr. 63; see also Tr. 256, 257), that Plaintiff "assisted with household chores, such as washing dishes, and . . . he also walked across the street to spend time with a friend at his shop – if the weather was not too hot" (Tr. 63; see also Tr. 91), and that Plaintiff "retained the ability to go out alone, [and] shop as needed" (Tr. 63; see also Tr. 258). Thus, by concluding that Plaintiff remained "able to perform day-to-day activities without being in a 'refrigerated-like' environment at all times . . . includ[ing] cooking and cleaning" (Tr. 67 (emphasis added)), the ALJ fulfilled her duty to weigh the conflicting evidence and determine which of those statements harmonized with the record evidence, see Craig, 76 F.3d at 589 ("Where conflicting evidence allows reasonable minds to differ as

15

to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." (internal quotation marks omitted)). Under such circumstances, the Court should not "undertake to reweigh [the] conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]," Craig, 76 F.3d at 589.

Lastly, the ALJ's consideration of the opinion evidence provides further support for her conclusion that, despite Plaintiff's anhidrotic ectodermal dysplasia, he remained able to perform medium work with without exposure to extremes of heat, wetness, or humidity. In that regard, the ALJ accorded "partial weight" to the opinions of the initial-level state agency medical consultant, crediting the consultant's opinion that Plaintiff remained capable of performing medium work despite his anhidrotic ectodermal dysplasia, but faulting the opinion for failing to include "environmental limitations in consideration of [Plaintiff]'s lack of sweat glands and susceptibility to difficult[y] regulating his body temperature in extreme heat." (Tr. 68; see also Tr. 131.) The ALJ also afforded the reconsideration-level consultant's opinions "partial weight," agreeing with the consultant's preclusion "of even moderate exposure to extreme heat, wetness, and humidity," but disagreeing with the consultant's finding that Plaintiff remained able to

16

perform work at all levels of exertion.  (Tr. 68; see also Tr. 145.)

In sum, Plaintiff has not shown that "[t]he ALJ committed reversible error by failing to explain the impact of anhidrotic ectodermal dysplasia on [Plaintiff]'s RFC."  (Docket Entry 9 at 2 (bold font and single-spacing omitted).)

### III. CONCLUSION

Plaintiff has not established grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security (Docket Entry 8) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 10) be granted, and that judgment be entered dismissing this action.

/s/ L. Patrick Auld
**L. Patrick Auld
United States Magistrate Judge**

August 27, 2020